ALICIA A.G. LIMTIACO
United States Attorney
MARIVIC P. DAVID
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
PHONE: (671) 472-7332
FAX: (671) 472-7215

Attorneys for the United States of America

F I L E D
Clerk
District Court

JUN 2 5 2014

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE QUE,<br><br>Defendant. | CRIMINAL CASE NO. 13-00002<br><br>**DEFERRED PROSECUTION AGREEMENT** |

The United States and Defendant, GEORGE QUE, enter into this Deferred Prosecution Agreement (hereinafter, "the Agreement"):

1. The United States has filed an Indictment against Defendant GEORGE QUE and others in the United States District Court for the Northern Mariana Islands charging the defendants with (Count 1) Conspiracy to Cause a Financial Institution to Fail to File a Currency Transaction Report, in violation of 18 U.S.C. § 371; and (Counts 2 to 10) Causing a Financial Institution to Fail to File a Currency Transaction Report, in violation of 31 U.S.C. §§ 5324(a)(1) and (d)(2).

2. Defendant GEORGE QUE accepts and acknowledges responsibility for his conduct giving rise to the Indictment as set forth in the Statement of Facts attached hereto and

incorporated by reference herein as Appendix A (hereinafter, "Statement of Facts").

3. Defendant GEORGE QUE agrees that he, in accordance with applicable laws: (a) shall provide to the United States, on request, any relevant document, electronic data, or other object concerning matters relating to this investigation in his possession, custody and/or control. This obligation shall not include production of materials covered by the attorney-client privilege or the work product doctrine; (b) shall make a full, complete and truthful statement regarding his involvement in criminal conduct, as well as the involvement of all others known to him. He agrees to testify fully and truthfully at any trials or hearings. He understands that this Agreement is not conditioned on the outcome of any trial. He further understands, however, that this Agreement is contingent on complete and truthful testimony by Defendant in response to questions asked by the Court, the prosecutor, or lawyers for any party; (c) shall no longer work in any position in a financial institution in the United States, within the meaning of the Bank Secrecy Act and its implementing regulations, in which he would be responsible for, or supervise employees responsible for, handling currency (such as a casino cashier, dealer, or bank teller), to be effective thirty (30) days after the Agreement is approved by the Court; and (d) shall pay the sum of at least $5,000 to be applied towards any civil monetary penalty imposed by the United States Government, its agencies and representatives. The amount of $5,000 may be paid in installments to be determined by the United States but must be paid in full within the period of deferred prosecution. GEORGE QUE understands that he may be subject to civil and equitable claims, demands or causes of action by the United States and others, and that the Agreement in no way affects these claims, demands or causes of action.

4. In consideration of Defendant GEORGE QUE's willingness to: (a) acknowledge responsibility for his conduct as detailed in the Statement of Facts; (b) continue his cooperation

with the United States; (c) agree to no longer work, as set forth in Paragraph 3 above, in a financial institution, within the meaning of the Bank Secrecy Act and its implementing regulations, in the United States, to be effective thirty (30) days after the Agreement is approved by the Court; and (d) pay the sum of at least $5,000 to be applied towards any civil monetary penalty imposed by the United States Government, its agencies and representatives, the United States shall recommend to the Court, pursuant to 18 U.S.C. § 3161(h)(2), that prosecution of GEORGE QUE on the Indictment filed against him on May 9, 2013 in Criminal Case No. 13-00002, be deferred for a period of eighteen (18) months. GEORGE QUE shall consent to a motion, the contents to be agreed by the parties, to be filed by the United States with the Court promptly upon execution of this Agreement, pursuant to 18 U.S.C. § 3161(h)(2), in which the United States will present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of eighteen (18) months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution. GEORGE QUE further agrees to waive and does hereby expressly waive any and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, 18 U.S.C. § 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Northern Mariana Islands for the period that this Agreement is in effect.

5. Defendant GEORGE QUE hereby further expressly agrees that any violations of the Bank Secrecy Act pursuant to 31 U.S.C. §§ 5318(h), 5322(b), 5324(a) and (d)(2) that were not time-barred by the applicable statute of limitations as of the date of this Agreement may, in the sole reasonable discretion of the United States, be charged against GEORGE QUE within six (6) months of any breach of this Agreement notwithstanding the expiration of any applicable statute

- 3 -

1  of limitations.

2      6. The United States agrees that if GEORGE QUE is in compliance in all material
3  aspects with all of its obligations under this Agreement, the United States, within thirty (30) days
4  of the expiration of the time period set forth in Paragraph 4 above, shall seek dismissal with
5  prejudice of the Indictment, and this Agreement shall expire and be of no further force or effect.

6      7. Defendant GEORGE QUE and the United States understand that the Agreement to
7  defer prosecution of GEORGE QUE must be approved by the Court, in accordance with 18
8  U.S.C. § 3161(h)(2). Should the Court decline to approve a deferred prosecution for any reason,
9  both the United States and GEORGE QUE are released from any obligation imposed upon them
10 by this Agreement and this Agreement, including the Statement of Facts, shall be null and void.

11     8. Defendant GEORGE QUE understands and agrees that his commission of a crime
12 during the pendency of the Agreement will result in the United States proceeding with the
13 prosecution of defendant of the charges contained in the Indictment.

14     9. Should the United States determine that Defendant GEORGE QUE has committed a
15 willful and material breach of any provision of this Agreement, the United States shall provide
16 written notice to GEORGE QUE of the alleged breach and provide him with a thirty day (30)
17 period, or longer at the reasonable discretion of the United States, in which to make a
18 presentation to the United States to demonstrate that no breach has occurred or, to the extent
19 applicable, that the breach is not willful or material or has been cured. The parties hereto
20 expressly understand and agree that should GEORGE QUE fail to make a presentation to the
21 United States within such time period, it shall be presumed that GEORGE QUE is in willful and
22 material breach of this Agreement. The parties further understand and agree that the United
23 States' exercise of reasonable discretion under this paragraph is not subject to review in any
24

-4-

1 court or tribunal outside of the Department of Justice. In the event of an uncured willful and
2 material breach of this Agreement which results in a prosecution, such prosecution may be
3 premised upon the Statement of Facts and any information provided by or on behalf of GEORGE
4 QUE to the United States at any time, unless otherwise agreed when the information was
5 provided.

6   10. It is further understood that this Agreement is binding on GEORGE QUE and the
7 United States Department of Justice, but specifically does not bind any other federal agencies, or
8 any local authorities, although the United States will bring the cooperation of GEORGE QUE
9 and his compliance with his obligations under this Agreement to the attention of local
10 prosecuting offices or local and federal regulatory agencies, if requested by GEORGE QUE.

11   11. Defendant GEORGE QUE and the United States agree that, upon acceptance by the
12 Court, this Agreement and an Order deferring prosecution shall be publicly filed in the United
13 States District Court for the Northern Mariana Islands.
14 //
15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24

12. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between GEORGE QUE and the United States. No promises, agreements, or conditions shall be entered into and/or are binding upon GEORGE QUE or the United States unless expressly set forth in writing, signed by the United States, and GEORGE QUE's attorney. This Agreement supersedes any prior promises, agreements or conditions between GEORGE QUE and the United States.

DATED: 6/17/14

GEORGE QUE
Defendant

DATED: 6/17/14

ROBERT TORRES
Attorney for Defendant

ALICIA A.G. LIMTIACO
United States Attorney
Districts of Guam and the Northern Mariana Islands

DATED: 6/25/2014      BY: Ross K Nay for

MARIVIC P. DAVID
Assistant U.S. Attorney

**U.S.A. v. GEORGE QUE**
CR# 13-00002
Deferred Prosecution Agreement
Statement of Facts

1. Hong Kong Entertainment (Overseas) Investments, Ltd. dba Tinian Dynasty Hotel & Casino ("TDHC"), licensed and located in the Commonwealth of the Northern Mariana Islands, is and was at all relevant times a casino that had gross annual gaming revenues in excess of $1 million.

2. GEORGE QUE ("QUE") was a VIP Services Manager at TDHC from on or about March 2011 to April 2013.

3. Congress enacted the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and its implementing regulations ("BSA") to address an increase in criminal money laundering activities utilizing financial institutions. Among other provisions, it requires financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax, or regulatory investigations or proceedings. Casinos qualified as financial institutions within the meaning of the BSA.

4. One BSA mechanism available to uncover criminal activity conducted through casinos was a requirement that casinos file a "Currency Transaction Report for Casinos" ("CTRC"), or its electronic equivalent, with the Department of the Treasury, for any transaction involving more than $10,000 in currency. A CTRC consisted of three parts. Part I required the financial institution to verify and accurately record the name and address of the individual who conducted a reportable currency transaction, as well as to accurately record the identity, social security number, or taxpayer identification number of any person or entity on whose behalf the

Appendix A

1 currency transaction was conducted. Part II required the financial institution to record the date,
2 the amount of the transaction, and the form of the transaction. Part III required the name of the
3 financial institution where the transaction occurred, the person completing the CTRC, and the
4 person approving the completion and filing of the CTRC.

5     5. Another BSA mechanism to uncover criminal activity conducted through casinos was
6 a requirement that casinos file a "Suspicious Activity Report by Casinos" ("SARC") or it
7 electronic equivalent, with the Department of Treasury, for any transaction that the casino
8 knows, suspects, or has reason to suspect was suspicious, if the transaction was conducted or
9 attempted by, at, or through the casino, and the transaction involved or aggregated to at least
10 $5,000 in funds or other assets. A transaction was suspicious if the transaction, among other
11 things, was designed to evade any requirement in the BSA or its implementing regulations.

12     6. CTRCs and SARCs were required to be filed with the FinCEN, a bureau of the
13 Department of the Treasury.

14     7. In addition, the BSA and its implementing regulations required casinos to develop,
15 implement, and maintain an effective anti-money laundering compliance program that, at a
16 minimum, required casinos, among other things,

17     (1) to have effective written policies, procedures and controls for all of the
18     following: (i) verifying customer identification; or (ii) filing reports, such as
19     currency transaction reports and suspicious activity reports; or (iii) creating and
20     retaining records; or (iv) responding to law enforcement requests;
21     (2) to designate a person to assure day to day compliance with the anti-money
22     laundering program, including assuring that (i) casino employees properly files
23     reports, creates and retains records, in accordance with applicable requirements,
24

Appendix A

such as preparing and filing currency transaction reports and suspicious activity reports; and (ii) the program is updated as necessary to reflect new requirements;

or

(3) to provide education and/or training of appropriate personnel concerning their responsibilities under the program

8. QUE was aware that regulations required TDHC to file a Currency Transaction Report by Casinos ("CTRC") or equivalent form whenever it engaged in a transaction in currency, involving either cash in or cash out of more than $10,000 during a single gaming day. Before concluding any such transaction, TDHC was also required to verify and record, among other things, the name and address of the individual presenting a transaction.

9. TDHC failed to develop, implement, and maintain a system of internal controls reasonably designed to ensure compliance with BSA's requirements for filing CTRC or Suspicious Activity Report forms. TDHC did not comply with the CTRC reporting requirements for an extended period of time and had not ever filed a Suspicious Activity Report prior to April 25, 2013. During QUE's tenure as VIP Services Manager between on or about March 1, 2011 and April 24, 2013, TDHC failed to prepare CTRC forms for approximately $27 million in reportable currency transactions as required by the BSA and its regulations. In addition, TDHC failed to fully identify and disclose all individuals involved in or actually conducting the transactions and did not include any Social Security Numbers or Tax ID numbers on the CTRC forms. Furthermore, TDHC failed to file even those CTRC forms that were prepared, causing a total of approximately $90 million in reportable transactions to not be filed as required by law.

10. During May 2012 and September 2012, QUE spoke via telephone to an undercover law enforcement agent and assured him that he and his Russian business associate, another

Appendix A

1 undercover agent, could gamble at TDHC with large amounts of currency, and that no paperwork
2 would be filed by the casino to report such transactions, except to the CNMI Customs at the
3 Saipan airport.  Between February 28, 2013 and March 4, 2013, two undercover law
4 enforcement agents posed as casino players at the TDHC and conducted currency transactions
5 totaling $450,130. Tim Blyth, the casino general manager, and QUE met the undercover agents
6 and knew they each conducted several currency transactions that required the preparation and
7 filing of CTRCs. TDHC did not obtain or otherwise possess any identifying information for one
8 of the undercover agents who conducted reportable cash transactions, and that it was therefore
9 impossible for the casino to prepare or file an accurate accounting of the customer's transactions
10 on a CTRC. TDHC, in fact, prepared a CTRC for the agent who had not provided any
11 identification, but failed to include the date of birth, Social Security or Tax ID number, address,
12 or any other identifying information, and did not file the report as required by law.

13     11.  Blyth and QUE failed to ensure that sufficient customer identification was obtained
14 to enable TDHC to prepare and file a substantially complete CTRC for each reportable
15 transaction or series of transactions.

16     12.  The repeated requests by the two undercover law enforcement agents to Blyth and
17 QUE to not make or file a CTRC relating to their reportable currency transactions required
18 TDHC to prepare and file a Suspicious Activity Report within 30 calendar days of the activity.
19 The refusal of one of the agents to provide any means of identification in connection with his
20 reportable currency transactions also required the filing of a Suspicious Activity Report.  No
21 Suspicious Activity Report was prepared or filed by TDHC.

22     13. TDHC failed to develop, implement, and maintain an effective anti-money
23 laundering program, as part of a pattern of illegal activity involving more than $100,000 in a 12-
24

Appendix A

month period.  As a result TDHC, Blyth and QUE failed to identify and report potential money laundering activity.

14.  The United States and QUE agree that this Statement of Facts is sufficient to support the filing of the Deferred Prosecution Agreement.  This Statement of Fact is made for that limited purpose and does not contain all facts relating to the underlying criminal conduct.

Appendix A